574 So.2d 364 (1990)
Milton J. WATTS and Gregory T. Watts
v.
AETNA CASUALTY AND SURETY COMPANY.
No. CA 89 0761.
Court of Appeal of Louisiana, First Circuit.
August 28, 1990.
*366 Karen Edelmon and R. Loren Kleinpeter, Baton Rouge, and Ron S. Maclauso, Hammond, for plaintiffs-appellees.
Steven Dow Oliver, Jack Chappuis, Jr., and Delbert G. Talley, Gretna, for defendant-appellant Aetna Cas. & Sur. Co.
Horace A. Lane, Baton Rouge, for Albert Morris Summers.
Edward P. Lobman, Metairie, for United Pacific Ins. Co.
Stevan C. Dittman, New Orleans, for Jewel Hoyt, et al.
Before EDWARDS, LANIER and FOIL, JJ.
LANIER, Judge.
This action is a suit by two insureds for a declaratory judgment to determine the coverage limits of an automobile excess liability insurance contract. The excess insurer contended its policy was unambiguous, the insureds' primary policy provided coverage of $100,000 per person and $300,000 per occurrence, the excess policy required minimum primary coverage limits of $250,000 per person and $500,000 per occurrence, and the insureds had a gap in coverage of $150,000 per person and $200,000 per occurrence. The trial court held the excess policy was ambiguous and "dropped down" to provide excess coverage from $100,000 per person to its maximum limit of $1,000,000 per occurrence. The trial court also dismissed two third party demands without prejudice.[1] The excess insurer took this devolutive appeal. The insureds and the third party plaintiffs and defendants answered the appeal.

BASIC FACTS
State Farm Mutual Automobile Insurance Company (State Farm) commenced insuring Milton Watts for primary automobile liability insurance coverage (primary policy) in May of 1961. Albert M. Summers was the State Farm agent who handled the transactions with Milton Watts.
In 1975, Milton Watts had a State Farm primary policy which provided split limit coverage of $25,000 per person, $50,000 per occurrence and $10,000 property damage. In 1975, the Rogillio-Scanlan Agency, Inc. (Agency) handled some of Milton Watts's other insurance and solicited him to buy an excess (umbrella) liability insurance policy (excess policy) from Aetna Casualty and Surety Company (Aetna). This excess policy went into effect on July 14, 1975, and apparently required minimum primary coverage of $100,000 per person and $200,000 per occurrence. For the 1976-77 policy year, the Aetna excess policy required minimum primary coverage of $250,000 per person and $500,000 per occurrence. This minimum primary coverage requirement remained in effect through the 1984-85 Aetna policy year.
In 1981, Milton Watts increased his primary policy coverage with State Farm to split limit coverage of $100,000 per person, $300,000 per occurrence and $50,000 property damage. This primary coverage remained in effect through August 31, 1983.
*367 In 1983, there were discussions between George Scanlan of the Agency, Summers (for State Farm) and Milton Watts concerning Milton Watts's primary and excess coverage. The testimony concerning this is summarized in the trial court's reasons for judgment as follows:
Scanlon further testified that it was the policy of the agency to check the limits of underlying coverage on the "umbrella policy" each year with the insurer. He testified that he would contact Watts every year regarding the underlying coverage and that Watts would always tell him it was in effect. This practice continued over the years, but Scanlon testified that when he contacted Watts during 1983 at the beginning of the policy year, Watts advised Scanlon that Watts "wasn't sure" of the underlying coverage and suggested that Scanlon contact Summers. Scanlon thereafter contacted Summers who confirmed the underlying coverage of one hundred thousand/three hundred thousand. Scanlon then testified that he contacted Watts to advise him that he would have to increase his coverage on the underlying policy, and that he contacted Summers again, who advised Scanlon that he would have to get back with Watts to obtain the authority to increase the underlying coverage. Scanlon testified that these conversations with Watts took place before the renewal of the policy, which was renewed for a policy period from July 14, 1983 July 14, 1984. As stated, the accident occurred on July 23, 1983.
Albert Morris Summers testified at the trial as well. Summers testified that as of January, 1977, Watts's underlying policy with State Farm was in the amount of twenty-five thousand per person, fifty thousand dollars per occurrence, and ten thousand dollars property damage. In May of 1981, the underlying coverage was increased to one hundred thousand dollars per person, three hundred thousand dollars per occurrence, and fifty thousand dollars in property damage. Summers further testified that, through this time, he was not even aware of the umbrella policy with Aetna. Based upon this testimony, it is interesting to note that Watts never had the underlying coverage which Aetna claimed to require, from the inception of the issuance of the umbrella policy. Likewise, Watts' increase in the underlying coverage through State Farm did not coincide with the subsequent requirement for an increase in such underlying coverage by Aetna.
Summers further testified that Scanlon contacted him sometime in 1983 and stated that Watts needed to increase the underlying coverage. Summers does not know the date of this conversation. Summers testified that he contacted Watts regarding this discrepancy, and Watts replied that he would "look into it and let me know". He stated that Watts never called him back.
Summers testified that in his opinion, Watts could have qualified at that time for increased underlying coverage, which State Farm offered. He stated that he would have been glad to have written the increase coverage for Watts had same been requested, but that it never was. Summers also testified that he did not recall advising Watts that there might be some "gap" in coverage between the underlying policy through State Farm and the "umbrella policy" from Aetna. Finally, Summers testified that the accident which gave rise to this action involved more than one claim.
Watts was recalled to the stand, and testified that he did not recollect ever talking to Morris Summers about any increase in his coverage. He stated that he "could have" had this conversation, and did not dispute what Summers and Scanlon said. However, he stood by his earlier testimony that he was relying on his insurance agents to provide the coverage he needed.[2]
On July 23, 1983, Gregory Watts, the son of Milton Watts, was involved in a two vehicle automobile accident.

*368 PROCEDURAL FACTS
On April 5, 1984, Jewel Hoyt, individually and as administrator of his minor child, Michael Hoyt, filed a suit (Hoyt tort suit) for damages in the 21st Judicial District Court, Parish of Tangipahoa, under docket number 71,384. He alleged that on July 23, 1983, Michael Hoyt was a guest passenger in a 1979 pickup truck owned and operated by Glema L. Kinchen; Kinchen was operating the vehicle in a westerly direction on Louisiana Highway 22 (Hwy. 22) in the vicinity of Ponchatoula, Louisiana; Kinchen brought his vehicle to a stop at the intersection of Hwy. 22 and Drude Lane; and shortly thereafter, the Kinchen vehicle was struck in the rear by a vehicle driven by Gregory Watts. Hoyt asserted his minor son was injured in the accident and his damages were itemized as $360,000. Named as defendants were Gregory Watts, T.W. Building, Inc., Aetna, Milton Watts, United Pacific Insurance Company (the uninsured motorist carrier on the Kinchen vehicle) and State Farm.
On October 23, 1987, the instant suit was filed by Milton Watts and Gregory Watts (the Watts) against Aetna under docket number 84,455. The Agency, Scanlan, State Farm and Summers were not parties plaintiff or defendant in this suit.
On January 22, 1988, the Watts filed a third party demand in the Hoyt tort suit against the Agency and Scanlan. The Watts alleged that if there was a gap in their liability insurance coverage between the State Farm and Aetna policies, the Agency and Scanlan were negligent and were liable for all sums for which the Watts were not covered by insurance. The Watts prayed for a money judgment "against George Scanlon [sic] and the Rogillio-Scanlon [sic] Agency, Inc. in an amount equal to any sums for which the petitioners may be cast on the main demands herein, and for which there is no insurance coverage afforded to petitioners by the policies issued by State Farm Mutual Automobile Insurance Company and the Aetna Casualty & Surety Company, and for such additional relief as the law, equity and nature of the case may permit." This prayer is a request for a conventional judgment; it is not a request for a declaratory judgment.
On March 23, 1988, the Agency and Scanlan filed in the Watts declaratory judgment suit (# 84,455) an answer to the Watts third party demand which was filed in the Hoyt tort suit (# 71,384) and a third party demand against State Farm and Summers. The Agency and Scanlan asserted that Summers was contacted by Scanlan prior to the accident and notified of the problem of the lack of the minimum required underlying coverage, and Summers and State Farm owed a duty to the Agency and Scanlan to notify them that the underlying coverage had not been obtained, or that, through the assurances or silence of Summers, the Agency and Scanlan were led to believe that the minimum underlying coverage had been obtained. The Agency and Scanlan prayed for a money judgment "against Albert Morris Summers and State Farm Mutual Automobile Insurance Company, as third party defendants, in full indemnification for all such sums for which they may be cast, including all interest and costs and, further in the alternative, if there is judgment against ROGILLIO-SCANLAN AGENCY, INC. and GEORGE SCANLAN, and, further, if they are not entitled to complete indemnification, there be judgment in favor of ROGILLIO-SCANLAN AGENCY, INC. and GEORGE SCANLAN against Albert Morris Summers and State Farm Mutual Automobile Insurance Company for contribution." This prayer is a request for a conventional judgment; it is not a request for a declaratory judgment.
On July 14, 1988, an order was filed which consolidated the Hoyt tort suit and the Watts declaratory judgment suit.

COVERAGE UNDER AETNA'S EXCESS POLICY

(Aetna's assignments of error numbers 1, 2, and 3)
Aetna contends the trial court erred in finding (1) there was ambiguity in the minimum coverage requirements of its policy, (2) the minimum coverage requirements *369 were met by the State Farm policy which provided coverage of $300,000 per occurrence and (3) the coverage of Aetna's excess policy "dropped down" to $100,000 per person leaving no gap in coverage.
The rules for interpreting a contract are found in La.C.C. art. 2045 et seq. Although a contract of insurance must provide the minimum amount of coverage required by statute, the parties may contract for additional coverage, if such coverage is not against good public policy. A contractual provision is null if it violates a rule of public order. La.C.C. art. 2030. The general rules for interpreting contracts of insurance have been set forth in Pareti v. Sentry Indemnity Company, 536 So.2d 417, 420 (La. 1988), as follows:
There are certain elementary legal principles which apply to the interpretation of insurance policies. An insurance policy is a contract and, as with all other contracts, it constitutes the law between the parties.... If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written....
An insurance contract is to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another.... If there is an ambiguity in a policy, then that ambiguity should be construed in favor of the insured and against the insurer.... However, courts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language. [Citations omitted.]
Further, courts should not strain to find an ambiguity where none exists. Cell-O-Mar, Inc. v. Gros, 479 So.2d 386 (La.App. 1st Cir.1985), writs denied, 481 So.2d 1332, 1333 (La. 1986). Whether a contract is ambiguous or not is a question of law. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989); Aycock v. Allied Enterprises, Inc., 517 So.2d 303 (La.App. 1st Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988).
Aetna argues that the State Farm policy is a split limits policy, not a combined limits policy. Under the Aetna policy, the holder of a split limit policy is required to carry minimum primary coverage limits of $250,000 for each person and $500,000 for each occurrence. Aetna argues that its coverage was clearly expressed in its policy and begins at $250,000 for each person and $500,000 for each occurrence, up to a maximum of $1,000,000 for each occurrence. State Farm, the primary insurer, is liable for a maximum of $100,000 per person and for $300,000 per occurrence, thereby creating $150,000 per person and $200,000 per occurrence gaps in coverage between the two policies. These coverages are stated in the policies, and Watts should have been aware of them. Therefore, argues Aetna, any gap is the fault of Watts.
Watts argues that the Aetna policy was ambiguous and that Aetna should provide excess coverage from the State Farm $100,000 per person maximum.
The trial court found that Section 1.6(b) was ambiguous, that Watts had met the last provision of Section 1.6(b) in that his State Farm policy provided coverage of $300,000 per occurrence and that the Aetna excess policy provided coverage above $100,000 per person. The trial judge stated the following in his reasons for judgment:
Plaintiffs other contention as to ambiguity in the policy concerns the schedule and definitions of underlying insurance set forth in the Aetna policy. This policy, with respect to automobile liability, provides minimum primary limits as follows:
Bodily injury liabilitytwo hundred fifty thousand dollars each person/five hundred thousand dollars each occurrence.
Property damage liabilitytwenty-five thousand dollars each occurrence or combined single limit
Bodily injury and property damage liabilitythree hundred thousand dollars each occurrence.
Plaintiffs contentions relate to a determination of the last mentioned limit of primary coverage, the combined feature *370 of bodily injury and property damage of three hundred thousand dollars for each occurrence. Plaintiff points out that his underlying coverage with State Farm provided a limitation of coverage of three hundred thousand dollars per occurrence (although one hundred thousand dollars for each person). This testimony was born out by an affidavit made part of the record and the testimony of Mr. Summers to the effect that multiple claims had been filed under this accident, triggering the "occurrence" feature of three hundred thousand dollar policy limitations.
It is noted that there was not a combined single limit coverage for bodily injury and property damage under the State Farm policy. However, the policy does provide coverage of three hundred thousand dollars per occurrence, in the event that two or more persons are injured in a given accident. Under these facts this Court is not able to determine that the Aetna policy was not ambiguous. Had it been Aetna's intention to insist upon underlying liability coverage of two hundred fifty thousand dollars per person, five hundred thousand dollars per occurrence, and twenty-five thousand dollars for property damage liability, the minimum primary limits set forth in the policy could have easily stopped there. However, by including a combined limitation for single limits of bodily injury and property damage liability of three hundred thousand dollars per occurrence, this Court feels that an ambiguity is created. The contentions of defendant in its post-trial memorandum that this creates a "hybrid coverage" which would fluctuate depending upon whether only one or more than one person was injured in an accident, if an ambiguity, again cannot, this Court determines, can be construed against the plaintiff.
As plaintiff has cited in his brief, and has been quoted above in this opinion, the Courts of this state are uniform in construing any such ambiguity against the insurer, for these reasons, this Court determines that, due to the fact that coverage was in effect under the underlying, State Farm policy providing three hundred thousand dollars of coverage for this occurrence, the minimum primary limits set forth in the Aetna "umbrella policy" are construed against Aetna, and this Court determines that the applicable minimum primary limits have been met by Watts.
Section 1.6(b) of the Aetna excess policy provides for minimum primary coverage limits with the following language:
Bodily Injury Liability$250,000 each person/$500,000 each occurrence.
Property Damage Liability$25,000 each occurrence or Combined Single Limit.
Bodily Injury and Property Damage Liability$300,000 each occurrence. (Emphasis added)
The word "or" indicates the disjunctive. See La.R.S. 1:9; La.C.C.P. art. 5056; La.C. Cr.P. art. 6; La.C.J.P. art. 5; Kelly v. Weil, 563 So.2d 221 (La. 1990); State v. Brenner, 486 So.2d 101 (La.1986); State v. Will, 536 So.2d 601 (La.App. 1st Cir.1988); Johnson v. Odom, 536 So.2d 541 (La.App. 1st Cir. 1988), writ denied, 537 So.2d 213 (La.1989); Crabtree v. Carr, 486 So.2d 921 (La.App. 1st Cir.), writ denied, 488 So.2d 690 (La. 1986); Mayor and Council of Morgan City v. Ascension Parish Police Jury, 468 So.2d 1291 (La.App. 1st Cir.1985). Generally, automobile insurance policies are written with "split" limits of liability in which the insurer's obligation for bodily injury is limited to a specific amount per person with a maximum amount per accident or occurrence, together with a separate limit for property damage liability coverage. However, some automobile policies are written with a "single" (or combined) limit per accident or occurrence for liability and property damage coverage. See W. McKenzie and H. Johnson, 15 Louisiana Civil Law Treatise: Insurance Law and Practice, Section 232, p. 434 (West. 1986). Section 1.6(b) is clear and unambiguous in providing that the primary coverage required is either a "split" limit policy providing bodily injury liability coverage of $250,000 for each person and $500,000 per occurrence, *371 and property damage liability coverage of $25,000 each occurrence, or a combined (single) limit policy with bodily injury and property damage liability coverage of $300,000 per occurrence. The trial court committed legal error in holding otherwise.
Watts's primary coverage with State Farm was a "split" limit policy providing bodily injury liability coverage of $100,000 per person and $300,000 per occurrence and property damage liability coverage of $50,000 per occurrence. It was not a combined (single) limit policy. Thus, Watts did not have the minimum primary coverage required by Section 1.6(b). The trial court erred in holding otherwise.
However, Watts's failure to comply with the requirements of Section 1.6(b) does not invalidate the Aetna policy. Section 5.13 of the Aetna policy, entitled "Maintenance of Underlying Insurance", states the following:
Insurance policies providing the coverage in Section 1.6 shall be maintained in full effect during the currency of this policy, except for any reduction in any limit of liability contained in such policy solely by payment of claims because of personal injury or property damage which occurs during the policy period.
Other than as provided in Exclusion (i) in Section 3, failure of the Insured named in Section 1.1 to comply with the foregoing paragraph shall not invalidate this policy but in the event of such failure the Company shall be obligated under this policy only to the extent that it would have been obligated had the Insured named in Section 1.1 complied therewith.

(Emphasis added)
Aetna's liability under the policy will be the same whether or not the primary coverage is properly maintained by the insured. Thus, we must look to the other provisions of the Aetna policy to determine its liability.
Section 4 of Aetna's policy defines its liability as follows:
(A) The Company shall be liable under the Personal Injury and Property Damage Liability Coverages only for ultimate net loss resulting from any one occurrence in excess of insured's underlying or retained limit, whichever is greater.

(1) UNDERLYING LIMITThe total of the applicable limits of liability of the underlying policies of insurance required to be maintained in force by the Insured and the amounts of any other underlying insurance collectible by the Insured;
(2) RETAINED LIMITThe amount stated in Section 1.5(a)

* * * * * *
(C) The applicable limits of liability of the underlying policies of insurance required to be maintained in force by the Insured shall be deemed to be the greater of the minimum primary limits specified in Section 1.6 and the actual limits (if different) of the underlying liability insurance policies in force.
(Emphasis added)
Section 1.5(a) states that the retained limit for personal injury and property damage coverage is $250. The language used in Section 4 is clear and unambiguous. It limits Aetna's liability to the greater of the underlying limits found in Section 1.6(b) (Bodily Injury Liability$250,000 each person/ $500,000 each occurrence and Property Damage Liability$25,000 each occurrence) or the retained limit ($250). The underlying limits found in Section 1.6(b) are greater than those in Section 1.5(a) and define Aetna's liability. A reading of the entire Aetna policy mandates this finding. Aetna's liability is not dependent upon whether the minimum coverage limits were met by Watts. Thus, Aetna's liability is limited to coverage of any excess liability over $250,000 for each person and $500,000 for each occurrence and up to a maximum of $1,000,000 for each occurrence. Cf. Kelly v. Weil, 563 So.2d 221 (La.1990); Robichaux v. Randolph, 563 So.2d 226 (La. 1990). The trial court erred as a matter of law in holding that the Aetna policy "provides personal excess indemnity coverage from $100,000 of State Farm Mutual Automobile *372 Insurance Company to its policy maximum of $1,000,000."
These assignments of error have merit.

VALIDITY OF THIRD PARTY DEMANDS
Milton Watts, Gregory Watts, the Agency, Scanlan, State Farm and Summers answered the Aetna appeal and assert that if we reverse the trial court judgment on the merits of the declaratory judgment, we should proceed to rule on the merits of the Watts and Agency-Scanlan third party demands.

The Watts Third Party Demand
As previously indicated, the Watts filed a third party demand against the Agency and Scanlan in the Hoyt tort suit (#71,384). This third party demand could not have been validly filed in the Watts declaratory judgment suit (# 84,455) because the Watts were plaintiffs, rather than defendants, in that action. Only a party defendant in a principal action may bring a third party demand (unless a party plaintiff becomes a party defendant in a reconventional demand). La.C.C.P. art. 1111; Welch v. Crown-Zellerbach Corp., 365 So.2d 586 (La.App. 1st Cir.1978). The trial court judge dismissed the Watts third party demand, even though it was not before him in the Watts declaratory judgment suit. This was error. Even though the instant case has been consolidated with the Hoyt tort suit, each suit remains a separate procedural entity. Galloway v. Ioppolo, 464 So.2d 386 (La.App. 1st Cir. 1985); Howard v. Hercules-Gallion Co., 417 So.2d 508 (La.App. 1st Cir.1982). Procedural rights peculiar to one case are not rendered applicable to a companion case by the mere fact of consolidation; each case must stand on its own procedural merits. Howard, 417 So.2d at 511. For example, this appeal is in the Watts declaratory judgment case; it is not in the Hoyt tort case. Further, as set forth hereinbelow, the Watts third party demand seeking indemnification from the Agency and Scanlan is not secondary or derivative in nature to a declaratory judgment interpreting the insurance contract; rather, it is secondary to and derives from the Hoyt tort claim for damages against the Watts.
Accordingly, we reverse the trial court judgment dismissing the Watts third party demand and order it reinstated in the Hoyt tort action (# 71,384).

The Agency-Scanlan Third Party Demand
As previously indicated, the Agency and Scanlan filed in the Watts declaratory judgment suit (# 84,455) an answer to the Watts third party demand (which was filed in the Hoyt tort suit # 71,384) and their own third party demand for indemnification, or in the alternative, contribution, from State Farm and Summers. This third party demand was properly dismissed by the trial court.
The instant case is a suit for a declaratory judgment filed pursuant to La.C.C.P. art. 1871 et seq. Its purpose is to determine the rights of parties to a written contract of insurance by resolving a question of the proper construction of the contract. La.C.C.P. art. 1872. The distinction between a declaratory judgment and a conventional judgment is explained in the Official Revision Comments for La.C.C.P. art. 1871, as follows:
The conventional type of judgment embodies two elements: (1) an ascertainment or declaration of the rights of the parties (usually implied); and (2) a specific award of relief. The declaratory judgment embodies only the first element which, of course, is always express. There is actually no such thing as a declaratory action, even if the sole relief prayed for is a declaratory judgment. The action is identical, regardless of whether greater or lesser relief is prayed for; the difference is only as to the type of judgment to be rendered.
The function of a declaratory judgment is simply to establish the rights of the parties or express the opinion of the court on a question of law without ordering anything to be done. State, Department of Transportation & Development v. Sugarland Ventures, Inc., 476 So.2d 970 (La.App. 1st *373 Cir.), writ denied, 478 So.2d 909 (La.1985). Thus, in their petition for a declaratory judgment the Watts pray for a judgment against Aetna "decreeing that the said policy of insurance issued by the defendant, AETNA CASUALTY AND SURETY COMPANY, entitles your petitions [sic] and obligates your defendant to provide personal excess indeminity [sic] coverage from the $100,000.00 maximum exposure STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY to the maximum amount of $1,000,000.00 for any and all claims arising from the policy period applicable to the AETNA CASUALTY AND SURETY COMPANY and specifically for coverage in connection with the accident of July 23, 1983; ..." The Watts do not seek a money judgment against Aetna or any other type of conventional relief.
Even though the Agency and Scanlan are not parties defendant in the Watts declaratory judgment suit, they filed a third party demand therein against State Farm and Summers seeking indemnification and/or contribution and sought a money (conventional) judgment. La.C.C.P. art. 1111 provides, in pertinent part, as follows:
The defendant in a principal action by petition may bring in any person, including a codefendant, who is his warrantor, or who is or may be liable to him for all or part of the principal demand. (Emphasis added)
Since the Agency and Scanlan were not parties defendant herein, they had no right of action (standing) to file this third party demand. Further, the Agency and Scanlan do not allege, and have not proven, that State Farm and Summers are their warrantors. Finally, the principal demand in this declaratory judgment action is for the interpretation of a contract. Thus, State Farm and Summers cannot "be liable to him [the Agency and Scanlan] for all or part of the principal demand" because the principal demand is not for a money judgment. The Agency-Scanlan third party demand is not germaine to the declaratory judgment suit in which it was filed and was properly dismissed. Cf. Hubbs v. Canova, 427 So.2d 875 (La.App. 1st Cir.1982). Since the trial court dismissed this third party demand without prejudice, it may be refiled in the Hoyt tort action.[3]

DECREE
For the foregoing reasons, the judgments of the trial court which declared the excess policy was ambiguous and that it "dropped down" to provide excess coverage from $100,000 to its policy maximum of $1,000,000 and dismissed the Watts third party demand are reversed. Judgment is rendered in favor of Aetna and against Milton Watts and Gregory Watts declaring that the Aetna policy is not ambiguous and that said policy provides excess coverage for bodily injury liability for amounts exceeding $250,000 for each person and $500,000 for each occurrence not to exceed a maximum of $1,000,000 for each occurrence. Judgment is further rendered in favor of the Watts and against the Agency and Scanlan reversing the dismissal of the Watts third party demand, and it is ordered that this third party demand be reinstated in the Hoyt tort suit (# 71,384) and adjudicated in accordance with law. The judgment dismissing the Agency-Scanlan third party demand without prejudice is affirmed, reserving to the Agency and Scanlan the right to refile it in the Hoyt tort suit (# 71,384). All costs in this suit (# 84,455) are assessed 50% to the Watts and 50% to the Agency and Scanlan.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
EDWARDS, J., concurs in the result.
NOTES
[1] In his reasons for judgment, the trial judge observed that since there was no gap in coverage," it is unnecessary to consider Watts third party demand against Roguillo-Scanlon [sic], or the third party demand filed by Roguillo-Scanlon [sic] against Summers and State Farm." However, in his judgment he dismissed the third party demands without prejudice. Where there is a conflict between reasons for judgment and a judgment, the judgment prevails. Owens v. U.S. Home, Inc., 552 So.2d 998 (La.App. 1st Cir.1989); Zeringue v. Zeringue, 479 So.2d 443 (La.App. 1st Cir.1985).
[2] The record indicates that the proper spelling is Scanlan, not Scanlon as appears in this quote.
[3] La.C.C. art. 1804; Thomas v. W & W Clarklift, Inc., 375 So.2d 375 (La.1979); Ragland v. Viator, 426 So.2d 231 (La.App. 1st Cir.1983); Matt v. Cox, 408 So.2d 389 (La.App. 1st Cir.1981).